# United States Court of Appeals
## for the Fourth Circuit

PUBLIC INTEREST LEGAL FOUNDATION,

*Plaintiff-Appellee,*

v.

HOWARD M. KNAPP, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF
THE SOUTH CAROLINA ELECTION COMMISSION,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court
For the District of South Carolina
At Columbia

———————————

## Brief of Defendant-Appellant

———————————

Tracey C. Green
Mary Elizabeth Crum
Michael R. Burchstead
BURR & FORMAN LLP
1221 Main Street, Suite 1800
Columbia, SC 29201
(803) 799-9800

Thomas W. Nicholson
STATE ELECTION COMMISSION
1122 Lady Street, Suite 500
Columbia, SC 29201
(803) 734-9063

*Counsel for Defendant-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1128__    Caption: __Public Interest Legal Foundation, Inc. v. Howard M. Knapp, in his__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Howard M. Knapp, in his official capacity as Executive Director of the South Carolina Election__
(name of party/amicus)

__Commission__

who is _____Appellant_____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Tracey C. Green                    Date: February 24, 2025

Counsel for: Appellant

Print to PDF for Filing

# Table of Contents

Table of Authorities..................................................................iv

Jurisdictional Statement........................................................1

Statement of the Issues..........................................................1

Introduction..............................................................................2

Statement of the Case ............................................................4

    1.   Statement of Facts. .......................................................4

    2.   Procedural History.......................................................6

        A.   Direct procedural history...................................6

        B.   Collateral matters...............................................6

    3.   Rulings presented for review. ....................................7

        A.   The September 18, 2024 order granting summary judgment to the Foundation and denying the Commission's summary judgment motion. ..........7

        B.   The January 7, 2025 Order denying the Commission's motion to reconsider. ..........................11

Summary of Argument........................................................13

Argument..................................................................................15

Standard of Review ...............................................................15

    1.   Standing......................................................................15

    2.   Appeals from cross-motions for summary judgment. .................16

    3.   Statutory interpretation. ...........................................16

Statutory Background...........................................................17

Analysis ...................................................................................18

    1.   The Foundation lacks standing because it did not allege, let alone establish, sufficient downstream consequences from its failure to receive the voter list....................................................................18

        A.   Standing is an Article III jurisdictional issue that may be raised at any time. .......................................19

B.   The Foundation was required to show downstream consequences from not receiving the voter list; a concrete, particularized injury does not arise from a mere statutory violation. ...................................................20

C.   The Foundation's allegations of downstream injury are not adequate to establish Article III standing. ...................24

(1)   The Complaint contains only superficial allegations insufficient to establish any downstream injury. ...................................................24

(2)   As a matter of law, the Foundation's allegations of diversion of resources, frustration of its mission, and prevention of its ability to investigate compliance with the law are insufficient to establish an actual Article III injury. ..........................26

(3)   The Foundation's representations during oral argument factually contradict that it has adequately alleged downstream consequences or an injury in fact. ...............................................29

(4)   The Foundation's stated purposes for using the voter list does not fit within the ambit of the NVRA. ...................................................30

D.   Summary of the Commission's arguments. ........................32

2.   The Foundation is not entitled to the voter list because the list of eligible state voters is not a "record[ ] concerning the implementation of programs and activities" for which disclosure is required by § 20507(i)(1). .......................................33

A.   The unambiguous terms and phrases "implementation," "program," "activity," and "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" all have meaning and limit § 20507(i)(1)'s coverage to records "concerning" the actions regulated by § 20507. ...............................................................34

B.   The district court erred by ignoring the ordinary meaning of all of the words and clauses in § 20507(i)(1) in favor of relying only on the term "concerning." ..............39

C.    The district court erred in concluding that this Court's Project Vote decision required the determination it reached and also erred in finding the First Circuit's Bellows decision persuasive................................................42

D.    Summary of the Commission's arguments..........................45

3.    Even assuming that the list of eligible state voters is a "record[ ] concerning the implementation of programs and activities" under § 20507(i)(1), the district court erred in finding that the South Carolina statute governing disclosure of the state's list is preempted by either the Elections Clause or the Supremacy Clause..........................................................46

A.    The district court erred in concluding that § 20507(i)(1) preempts § 7-3-20(D)(13)'s qualified elector restrictions because the Elections Clause does not extend that far and because neither § 7-3-20(D)(13) nor § 20507(i)(1) are directed to the "Times, Places and Manner of holding elections..............................................................................46

B.    The district court erred in failing to evaluate preemption in light of whether § 20507(i)(1)'s disclosure requirements are a "significant objective" of the NVRA.....49

C.    S.C. Code § 7-3-20(D)(13) is not preempted because it is no obstacle to the accomplishment of a significant federal regulatory objective of the NVRA and, therefore, the Commission can limit distribution of the voter list to qualified South Carolina electors. .......................................51

D.    Summary of the Commission's arguments..........................55

Conclusion ................................................................................................55

Request for Oral Argument.....................................................................56

iii

# Table of Authorities

**Page(s)**

## Cases

*Am. C.R. Union v. Martinez-Rivera,*
166 F. Supp. 3d 779 (W.D. Tex. 2015) ................................................. 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..................................................................... 27

*Beck v. McDonald,*
848 F.3d 262 (4th Cir. 2017) ........................................................ 15, 26

*Bedrock Ltd., LLC v. U.S.,*
541 U.S. 176 (2004) ..................................................................... 35

*Dep't of Educ. v. Brown,*
600 U.S. 551 (2023) ..................................................................... 23

*Casillas v. Madison Ave. Assocs., Inc.,*
926 F.3d 329 (7th Cir. 2019) (Barrett, J.) ........................................ 31

*City & Cnty. of San Francisco, California v. Env't Prot. Agency,*
604 U.S. ___, 145 S. Ct. 704 (2025) ................................. 35, 36, 41, 43

*Clapper v. Amnesty Int'l,*
568 U.S. 398, 416 (2013) .............................................................. 30

*Condon v. Reno,*
913 F. Supp. 946 (D.S.C. 1995) ...................................................... 31

*Cook v. Gralike,*
531 U.S. 510 (2001) ..................................................................... 47

*Dalton v. Little Rock Family Planning Servs.,*
516 U.S. 474 (1996) ..................................................................... 49

*David v. Alphin,*
704 F.3d 327 (4th Cir. 2013) ......................................................... 15

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
    601 U.S. 42 (2024) ................................................................ 34

*Dreher v. Experian Info. Sols., Inc.*,
    856 F.3d 337 (4th Cir. 2017) ...................................... *passim*

*Dwoskin v. Bank of Am., N.A.*,
    888 F.3d 117 (4th Cir. 2018) ............................................ 16

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ............................................................ 51

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998) ............................................... 23, 24, 31

*Fernandez v. RentGrow, Inc.*,
    116 F.4th 288 (4th Cir. 2024) ...................................... 21, 22

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .................................................. *passim*

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) .......................................................... 35

*Fusaro v. Cogan*,
    930 F.3d 241 (4th Cir. 2019) ............................................ 31

*United States v. George*,
    946 F.3d 643 (4th Cir. 2020) ............................................ 17

*Greater Birmingham Ministries v. Sec'y of State for
    Alabama*,
    105 F.4th 1324 (11th Cir. 2024) ...................................... 54

*Guthrie v. PHH Mortgage Corp.*,
    79 F.4th 328 (4th Cir. 2023) ............................................ 52

*United States v. Hays*,
    515 U.S. 737 (1995) .......................................................... 19

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ............................................................ 34

*Hierholzer v. Guzman,*
    125 F.4th 104 (4th Cir. 2025) ............................................. 19

*Hillman v. I.R.S.,*
    263 F.3d 338 (4th Cir. 2001) ............................................... 17

*Arizona v. Inter Tribal Council of Az., Inc.,*
    570 U.S. 1 (2013) ................................................................ 48

*Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
    144 S. Ct. 2560 (2024) ....................................................... 20

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.,*
    78 F.4th 622 (4th Cir. 2023) ............................................... 20

*Judicial Watch, Inc. v. Lamone,*
    399 F. Supp. 3d 425 (D. Md. 2019) .................................... 44

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ............................................... 19

*Lockhart v. United States,*
    577 U.S. 347 (2016) ........................................................... 37

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................... 20

*Maryland Election Integrity, LLC v. Maryland State Bd. of Elections,*
    127 F.4th 534 (4th Cir. 2025) ............................................. 39

*N. Virginia Hemp & Agric., LLC v. Virginia,*
    125 F.4th 472 (4th Cir. 2025) ............................................. 49

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995) ........................................................... 41

*O'Leary v. TrustedID, Inc.,*
    60 F.4th 240 (4th Cir. 2023) ............................................... 21

*Opiotennione v. Bozzuto Management Co.*,
130 F.4th 149 (4th Cir. 2025) ........................................... 30

*Penegar v. Liberty Mut. Ins. Co.*,
115 F.4th 294 (4th Cir. 2024) ........................................... 18

*Project Vote/Voting for America, Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) .............................. 9, 42, 43, 54

*Pub. Int. Legal Found., Inc. v. Matthews*,
589 F. Supp. 3d 932 (C.D. Ill. 2022) ................................. 44

*Public Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) .............................................. 23, 24, 31

*Public Interest Legal Foundation, Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .................................... 9, 43, 44

*Redeemed Christian Church of God (Victory Temple) Bowie,
Md. v. Prince George's Cnty., Md.*,
17 F.4th 497 (4th Cir. 2021) ............................................ 17

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand
at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) ............................................ 15

*Sharma v. Hirsch*,
121 F.4th 1033 (4th Cir. 2024) ........................................ 46

*Sheet Metal Workers' Health & Welfare Fund of N. Carolina
v. Stromberg Metal Works, Inc.*,
118 F.4th 621 (4th Cir. 2024) ......................................... 16

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
566 U.S. 560 (2012) ........................................................ 35

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ................................................. *passim*

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) ........................................................ 16

*Virginia Uranium, Inc. v. Warren,*
  587 U.S. 761 (2019) .............................................. 44, 50, 51

*Virginia Uranium, Inc. v. Warren,*
  848 F.3d 590 (4th Cir. 2017) .............................. 50, 52

*We CBD, LLC v. Planet Nine Priv. Air, LLC,*
  109 F.4th 295 (4th Cir. 2024) ........................... 16

**Statutes**

28 U.S.C.A. § 1291 ................................................. 1

28 U.S.C.A. § 1331 ................................................. 1

33 U.S.C.A. § 1311(b)(1)(C) ................................ 36

National Voter Registration Act, 52 U.S.C.A. §§ 20501-20511 ............... 5

52 U.S.C.A. § 20501(b)(3) .................................... 32

52 U.S.C.A. § 20501(b)(4) .................................... 32

52 U.S.C.A. § 20507(i)(1) .................................... 18, 52

52 U.S.C.A. § 20510(b) ....................................... 18, 30

Help America Vote Act, 52 U.S.C.A. §§ 20901-21145 ............... 4

52 U.S.C.A. § 21083 .............................................. 5

52 U.S.C.A. § 21083(a)(1)(A) ............................... 39

S.C. Code Ann. § 7-3-20(D)(13) ......................... 2, 5, 18

S.C. Code Ann. § 7-5-186(A) ............................... 5

**Constitutional Provisions**

U.S. CONST. art. I, § 4, cl. 1 ................................ 46

U.S. Const. art. VI, cl. 2 ...................................... 48

**Legislative Materials**

H.R. Rep. No. 103-9, § 8 (1993) .............................................. 51

Nat'l Voter Registration Act of 1993, Pub. L. No. 103-31, § 8,
    107 Stat. 77 (1993) ........................................................ 10

S. Rep. 103-6 (1993) ............................................................ 47

S. Rep. No. 103-6, § 8 (1993) ............................................... 51

**Rules**

Fed. R. Civ. P. 56(a) ............................................................ 16

**Other Authorities**

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) .............. 36, 37

## Jurisdictional Statement

The district court had subject matter jurisdiction over the Foundation's claims pursuant to 28 U.S.C.A. § 1331. The district court issued its Order and Judgment on September 18, 2024, disposing of all of the Foundation's claims. Defendant timely filed a motion for reconsideration on October 18, 2024, which the district court denied by Order dated January 7, 2025. Defendant filed its notice of appeal on February 6, 2024. This Court has jurisdiction to review the Orders pursuant to 28 U.S.C.A. § 1291.

## Statement of the Issues

1. The Supreme Court has held that an "asserted information injury that causes no adverse effects cannot satisfy Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) The Foundation claims an information injury arising from the Commission's rejection of its request for the state's list of eligible voters based on 52 U.S.C.A. § 20507(i)(1). However, the Foundation alleged that it had to divert resources due to the denial, that its organizational mission has been frustrated, and that it cannot investigate whether South Carolina officials are violating federal law. Allegations like these have been determined insufficient to establish a party's standing very recently in *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). Should this Court hold that the Foundation lacks standing to maintain this action?

2. A state is required by 52 U.S.C.A. § 20507(i)(1) to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The Foundation requested a copy of a list of registered South Carolina

voters. The Commission denied that request in part because it does not use that list to perform any maintenance or voter registration responsibilities that are required by § 20507. Did the district court err in determining that § 20507(i)(1) requires the Commission to make that list available to the Foundation even though the list is not a record regarding a program or activity implemented by the Commission pursuant to § 20507?

3. Even assuming that the eligible voter list falls within 52 U.S.C.A. § 20507(i)(1), neither the statutory language nor the legislative history express any limitation on what states may do to manage the dissemination of that list. South Carolina has enacted statutes that limit the Commission to providing the eligible voter list to South Carolina registered voters. The Foundation is neither a South Carolina resident nor a registered voter. Did the district court err in determining that § 20507(i)(1) preempts South Carolina statutes limiting the provision of the list to eligible voters?

## Introduction

The Foundation is a Virginia-based corporation and, as such, is neither registered to vote in nor a resident of South Carolina. Nonetheless, it requested that the Commission give it a list of registered South Carolina voters even though a state statute, S.C. Code Ann. § 7-3-20(D)(13), limits distribution of that list to registered voters. The ostensible basis for the request is 52 U.S.C.A. § 20507(i)(1), which requires states to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The Commission denied the request because it must

comply with state law, but the Foundation initiated this action to obtain the documents

The district court erred in ruling that the Foundation is entitled to the documents. As an initial matter, which was not raised during the briefing and argument on cross-motions for summary judgment, the Foundation lacks standing because it has not adequately alleged or identified any cognizable injury resulting from the denial. Even though the Foundation claims an informational injury, it must nevertheless demonstrate some downstream consequences beyond the mere denial of its request. It has not adequately done so because the reasons that it has asserted have been held insufficient by the Supreme Court and this Court. *See* discussion *infra* Argument Part 1.

Even assuming that the Foundation has standing, the district court erred in ruling that § 20507(i)(1) requires giving it the voter list. That statute requires only that states provide information regarding the programs and activities implemented pursuant to § 20507 for the purpose of ensuring that the list is accurate. But a proper textual reading of the statute yields the conclusion that the only records subject to disclosure are those involving the implementation of programs and

activities. The district court recognized that the voter list is the output of those programs and activities, but nonetheless erred by allowing the statutory term "concerning" to overshadow the term "implemented" to conclude that the Foundation must be given the voter list. *See* discussion *infra* Argument Part 2.

Finally, assuming that it correctly ruled that § 20507(i)(1) encompasses the voter list, the district court erred in ruling that the state statute restricting dissemination of the voter list is preempted by § 20507(i)(1). The Elections Clause does not reach as far as the court concluded and disclosure is not a significant objective of the federal legislation. As such, § 20507(i)(1) and § 7-3-20(D)(13) can operate together because both allow access to the list and § 7-3-20(D)(13) does nothing more than merely tailor that access consistent with the State's objective. The district court erred in ruling that § 7-3-20(D)(13) is preempted. *See* discussion *infra* Argument Part 3.

## Statement of the Case

**1.    Statement of Facts.**

Pursuant to the Help America Vote Act, 52 U.S.C.A. §§ 20901-21145 (HAVA), the Commission maintains a statewide voter

registration database. § 21083; S.C. Code Ann. § 7-5-186(A); Stips. 5-8 (JA 050). Included in this database is the Statewide Voter Registration List, which contains the name of each active registered voter. Stips. 9, 16 (JA 051, JA 053). The Executive Director must provide this list to a registered South Carolina voter who asks for it and pays a reasonable price. S.C. Code Ann. § 7-3-20(D)(13); Stips. 9-10 (JA 051-053).

On February 5, 2024, asserting the National Voter Registration Act of 1993 (NVRA) as its authority, 52 U.S.C.A. §§ 20501-20511, the Foundation requested that the Commission "reproduce or provide the opportunity to inspect . . . [a] current or most updated copy of the South Carolina statewide voter registration list as described in S.C. Code § 7-5-186." Compl., Ex. A (JA 018); Stip. 1 (JA 049). The Foundation asserted 52 U.S.C.A. § 20507(i)(1) as the statutory basis for its request. Compl., Ex. A (JA 018); Stip. 1 (JA 049). The Executive Director denied that request on February 20, 2024, explaining that he "does not have the discretion to abrogate S.C. Code § 7-3-20(D)(13)."[1] Compl., Ex. B (JA 020); Stip. 2 (JA 049). The next day, the Foundation responded by claiming

---

[1] As set forth below, § 7-3-20(D)(13) allows the Commission to provide the voter list only to South Carolina registered voters.

that the Commission was violating the NVRA and stating that it would file suit if not provided the voter list. Compl., Ex. C (JA 021); Stip. 3 (JA 050). The Commission again rejected the Foundation's request on March 12, 2024. Stip. 4 (JA 050).

## 2. Procedural History.

### A. *Direct procedural history.*

The Foundation filed suit on March 14, 2024. (JA 008). Pursuant to a scheduling order, the parties filed and briefed cross-motions for summary judgment. The district court heard argument on those motions on September 15, 2024, and issued its Order and Judgment on September 18, 2024, ruling in favor of the Foundation on all claims and directing the Commission to provide the voter list to the Foundation. (JA 094-110). The Commission moved for reconsideration of the Order and Judgment on October 18, 2024, but the district court denied that motion by written order dated January 7, 2025. (JA 111-117). The Commission timely appealed from the September 18, 2024 and January 7, 2025 Orders on February 6, 2025. (JA 118-119).

### B. *Collateral matters.*

The Commission moved for a stay of the Order and Judgment pending resolution of the motion to reconsider and, if necessary, appeal.

(ECF No. 44). The district court granted that motion on January 7, 2025. (ECF No. 52). On October 2, 2024, the Foundation moved for an award of attorneys' fees and costs, which the district court granted in part and denied in part on January 7, 2025. (ECF No. 54). On February 6, 2025, the Commission moved to stay the award of fees pending appeal and for leave of court to deposit the fee award plus accrued interest with the Clerk of Court. (ECF No. 54). The court granted that motion on February 26, 2025. (ECF No. 61). The amount of $91,374.84 representing the fee award plus interest was received by the Clerk of Court on March 19, 2025. No party has appealed from the stays granted or the fees awarded.

**3.    Rulings presented for review.**

**A.    *The September 18, 2024 order granting summary judgment to the Foundation and denying the Commission's summary judgment motion.***

The district court framed the first issue as whether the voter list "falls within the disclosure mandate of the NVRA." Order at 7 (JA 100). It ultimately concluded that it does, stating that "a reading of the plain language of the statute reveals no ambiguities and points to the clear conclusion that the [voter list] concerns the [Commission]'s list

maintenance activities and is therefore subject to disclosure under the NVRA. *Id.* at 11 (JA 104).

The court reviewed the Commission's argument that the voter list does not fall within the disclosure mandate because the list is not used to ensure "accuracy and currency." *Id.* at 8 (JA 101). It noted that "the [Commission] explains that the [voter list] is merely a summary of numerous other records and reports, gathered from various sources, that are themselves used to confirm accuracy and otherwise maintain the list." *Id.* (JA 101).

The district court ruled that the Commission's "posited classification of the [voter list] looks past the plain language of the NVRA." *Id.* (JA 101). The court characterized the NVRA as "a broad statute which covers all records 'concerning' efforts to maintain an accurate and current list of eligible voters." *Id.* (JA 101). ("How then, can a report which identifies the most updated list of eligible voters not be a record concerning the efforts made to ensure an accurate and current list of voters?"). The court noted the following:

> To be fair, the [voter list] is properly classified as an output of all other records or reports which the [Commission] utilizes to add and remove voters for various reasons such as death or felony conviction. These maintenance activities are conducted

via VREMS which serves as the single system for storing and managing the official list of registered voters throughout the state. But the fact that the list is an output or summary of the records does not somehow mean it is any less 'concerning' of maintenance efforts." Stated differently, the [voter list] represents the end-product of the State's list maintenance activities. Thus, the [list] concerns those maintenance activities.

*Id.* at 9 (JA 102).

The district court then reviewed *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 332-33 (4th Cir. 2012), which held that § 20507(i)(1) requires disclosing voter registration applications. *Id.* (JA 102). It noted this Court's holding that § 20507(i)(1)'s use of the word "all" "'suggests an expansive meaning'" and, thus, that the disclosure requirement "'unmistakably encompasses completed voter registration applications.'" *Id.* (JA 102) (quoting *Project Vote*, 682 F.3d at 336). The district court determined that, "[w]hile the [Commission] is correct that *Project Vote* did not involve precisely the same documents requested by [the Foundation], the Fourth Circuit opinion leaves little, if any, doubt that the NVRA applies equally to the records sought here." Order at 9-10 (JA 102-103).

The district court also considered *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). It noted that a voter list like

that sought by the Foundation was at issue in that case. Order at 10 (JA 103). In pertinent part, it quoted from the First Circuit's decision as follows:

> "[A]s of the date it is generated, the Voter File reflects the additions and changes made by Maine election officials in the CVR [database] pursuant to federal and state law as part of Maine's voter list registration and maintenance activities. The Voter File can thus be characterized as the output and end result of such activities. In this way, the Voter File plainly relates to the carrying out of Maine's voter list registration and maintenance activities and is thereby subject to disclosure under Section 8(i)(1)."

*Id.* (JA 103) (quoting *Bellows*, 92 F.4th at 47)[2]. The court stated that the voter list is "generated from the electronic reporting system which shows the current status of eligible South Carolina voters and thus concerns list registration and maintenance activities." *Id.* (JA 103). It determined that "the activities of updating voters' already-existing information in the VREMS and removing ineligible voters from the list are conducted to ensure that South Carolina is keeping an accurate and current account of its official lists of eligible voters." *Id.* at 10-11 (JA 103-104). The district

---

[2] Section 20507 is often referred to as Section 8, because the section number used in the original legislation. *See* Nat'l Voter Registration Act of 1993, Pub. L. No. 103-31, § 8, 107 Stat. 77 (1993); *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 786 (W.D. Tex. 2015).

court concluded that the voter list "is a reflection of these continuous maintenance and accuracy efforts and therefore concerns the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* at 11 (JA 104).

The district court identified the second issue as, if the voter list is subject to disclosure, "is the South Carolina law preventing disclosure to [the Foundation] preempted by the NVRA pursuant to the Supremacy Clause?" *Id.* at 7 (JA 100). The court ultimately applied the Elections Clause and determined that § 7-3-20(D)(13) is preempted because the "disclosure mandate within the NVRA covers the [voter list]" and, thus, that South Carolina's statutes are preempted because they "prevent compliance with the plain language mandates of the NVRA." *Id.* at 15 (JA 108).

**B.** ***The January 7, 2025 Order denying the Commission's motion to reconsider.***

The district court denied the Commission's motion to reconsider and grant summary judgment to it regarding South Carolina laws requiring "redaction of Social Security Numbers, prohibiting the use of commercial solicitation, and allowing for a reasonable fee" for the voter

list. Recons. Order at 4 (JA 114). The court determined that there was no controversy regarding these matters because of the positions that the Foundation took. *Id.* (JA 114).

The district court further denied the Commission's motion to alter or amend its order to grant summary judgment on whether the NVRA encompasses the voter list and, if so, whether the state law restriction on distributing that list only to registered state voters is preempted. The district court denied that motion on the basis that nothing new was presented for its consideration. *Id.* at 5 (JA 115).

Last, the district court considered the Commission's Rule 60(a) request to remove an ambiguity. The Commission contended that the Order's language could suggest that S.C. Code Ann. § 7-3-20(D)(13) was completely preempted, although language in another part of the Order suggested it was only preempted regarding limitations on distributing the voter list. *Id.* at 5-6 (JA 115-116). The court rejected that contention on the basis that the Foundation did not challenge the statutory limitations on commercial solicitation and that the Order in any event prescribed the mandated relief: preemption of any state law restricting

distribution of the voter list to South Carolina voters. *Id.* at 6-7 (JA 116-117).

## Summary of Argument

The Foundation lacks standing because it has not alleged sufficient downstream consequences flowing from its asserted informational injury. Governing precedent of the Supreme Court, including but not limited to *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) and the recently decided *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024), dictate this conclusion. *TransUnion* held that asserting the violation of a disclosure statute is not enough to establish an informational injury. Implicitly recognizing as much, the Foundation asserted it was injured through the diversion of resources, the frustration of its mission, and the ability to investigate whether State officials are complying with the law. But *Hippocratic Medicine* and other precedent of the Supreme Court and this Court require rejecting those alleged injuries as sufficient to maintain this action, especially since the Foundation acknowledged it could gain access to the voter list by other means.

In any event, the Foundation is not entitled to the voter list because it is not a "record[ ] concerning the implementation of programs and activities" as required by § 20507(i)(1). The district court recognized that the voter list is the output of the programs and activities implemented pursuant to § 20507, but ruled that the list falls within § 20507(i)(1) because it concerns those programs and activities. However, a proper interpretation of the statutory text requires concluding that the district court erred because the voter list does not concern the implementation of those programs and activities

Finally, even assuming that § 20507(i)(1) textually encompasses the voter list, the district court erred in concluding that the statute preempts § 7-3-20(D)(13). Neither the Elections Clause nor the Supremacy Clause reach so far as to allow § 20507(i)(1) to displace § 7-3-20(D)(13) because both may operate together given that there is no evidence or indication that disclosure of records was a significant objective of § 20507 or the NVRA in general.

## Argument

## Standard of Review

### 1. Standing

"A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (cleaned up). "In a facial challenge, the defendant contends that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (cleaned up). "Accordingly, the plaintiff is afforded the same procedural protection as [it] would receive under a Rule 12(b)(6) consideration, wherein the facts alleged in the complaint are taken as true, and the defendant's challenge must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.* (cleaned up). However, the Court need not "take account of allegations in the complaint labeled as fact but that constitute nothing more than 'legal conclusions' or 'naked assertions.'" *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). And it is "powerless to create [its] own jurisdiction by embellishing otherwise deficient allegations of standing." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,* 713 F.3d 175, 182 (4th Cir. 2013)) (cleaned up).

## 2. Appeals from cross-motions for summary judgment.

"This Court reviews de novo a district court's disposition of cross-motions for summary judgment." *Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. Stromberg Metal Works, Inc.*, 118 F.4th 621, 631 (4th Cir. 2024). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under" Federal Rule of Civil Procedure 56. *Id.* (cleaned up); *see also We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 301 (4th Cir. 2024) ("In conducting our de novo review of a summary judgment award, we apply the same legal standards as those applied by the district court."). Under that standard, a movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Stromberg Metal Works*, 118 F.4th at 631.

## 3. Statutory interpretation.

Statutory interpretation begins with the language of the statute, "giving the words used their ordinary meaning." *E.g.*, *Dwoskin v. Bank of Am., N.A.*, 888 F.3d 117, 119 (4th Cir. 2018) (cleaned up). The statutory terms must be read in context "and with a view to their place in the overall statutory scheme." *Utility Air Regulatory Group v. EPA*, 573 U.S.

302, 320 (2014) (cleaned up). If the language is plain and unambiguous, based on the ordinary meaning of the words when the statute was enacted, "that meaning controls." *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cnty., Md.*, 17 F.4th 497, 508 (4th Cir. 2021); *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). The rules of statutory interpretation are applied only if there is an ambiguity in the statutory language. *Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001).

## Statutory Background

The federal statute that the Foundation cites as authority for its request is 52 U.S.C.A. § 20507(i)(1), which states as follows:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

The statutory language pertinent to this case is the language requiring the states to make available for inspection and photocopying "all records concerning the implementation of programs and activities conducted for

the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1).

The state statute that restricts disclosure of the list of registered voters to qualified electors is S.C. Code Ann. § 7-3-20(D)(13):

> The executive director [of the Commission] shall . . . furnish at reasonable price any precinct lists to a qualified elector requesting them.

The Executive Director relied on this statute when denying the Foundation's request.

## Analysis

**1. The Foundation lacks standing because it did not allege, let alone establish, sufficient downstream consequences from its failure to receive the voter list.**

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Hippocratic Med.*, 602 U.S. at 378. In order "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander . . . ." *Id.* at 379. "For a case or controversy to exist, the plaintiff must have a personal stake in the case—in other words, standing." *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 299 (4th Cir. 2024) (cleaned up). The Foundation seeks to invoke this Court's jurisdiction pursuant to 52 U.S.C.A. § 20510(b) ("A person who is

aggrieved by a violation of this chapter . . . may bring a civil action . . . .”). *See* Compl. ¶ 1 (JA 008)

"It is elemental that the party invoking federal jurisdiction, bears the burden of establishing standing." *Hierholzer v. Guzman*, 125 F.4th 104, 115 (4th Cir. 2025) (cleaned up). To evaluate the Foundation's organizational standing, this Court "must conduct the same inquiry as in the case of an individual." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (cleaned up). Thus, the Foundation must demonstrate the usual elements of standing: "(i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Hippocratic Med.*, 602 U.S. at 380. For the reasons that follow, the Foundation lacks standing to maintain this action.

**A.    *Standing is an Article III jurisdictional issue that may be raised at any time.***

Even though the Commission did not challenge standing in its summary judgment motion nor did the district court adjudicate the question, the issue may be raised on appeal. *See, e.g., United States v. Hays*, 515 U.S. 737, 742 (1995) ("The federal courts are under an

independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.") (cleaned up); *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 628 (4th Cir. 2023) ("[B]ecause standing is jurisdictional, it may be raised and addressed for the first time on appeal."), *cert. denied sub nom. Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 144 S. Ct. 2560 (2024). Additionally, the Commission asserted a lack of standing as affirmative defenses in its Answer. Answer ¶¶ 41, 43 (JA 034-035). The Commission respectfully contends that the Foundation lacks standing.

**B.    *The Foundation was required to show downstream consequences from not receiving the voter list; a concrete, particularized injury does not arise from a mere statutory violation.***

To meet the requirements of Article III, an injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). In turn, a "concrete injury is de facto, meaning that it must actually exist and is real, and not abstract." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 344 (4th Cir. 2017) (cleaned up).

The Foundation's alleged informational injury is concrete only if it has a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Fernandez v. RentGrow, Inc.,* 116 F.4th 288, 295 (4th Cir. 2024) (cleaned up). This inquiry, which "is [c]entral to assessing concreteness," *TransUnion*, 594 U.S. at 417, "asks whether plaintiff[ ] ha[s] identified a close historical or common-law analogue for their asserted injury." *Fernandez*, 116 F.4th at 295 (cleaned up). Although the analogue "does not require an exact duplicate in American history and tradition," the inexactness of this standard is not "an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *TransUnion,* 594 U.S. at 424-25.

When evaluating a party's standing to maintain a claim based on a statutory violation, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion*, 594 U.S. at 426–27. This is because "under Article III, an injury in law is not an injury in fact." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 243 (4th

Cir. 2023) (cleaned up). "[O]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation" have Article III standing to sue." *Fernandez*, 116 F.4th at 294-95 (cleaned up). In sum, "'federal courts [have] the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions.'" *TransUnion*, 594 U.S. at 427 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019) (Barrett, J.)).

The Foundation claims standing by virtue of allegedly having suffered an informational injury. But for such an injury to be concrete, a plaintiff must show more than a statutory violation; it must establish "downstream consequences" or "adverse effects"[3] from being deprived of the information it seeks. *See TransUnion,* 594 U.S. at 442 ("An asserted informational injury that causes no adverse effects cannot satisfy Article III.") (cleaned up); *Dreher,* 856 F.3d at 345 ("[A] constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled *and* that the denial of that

---

[3] In *TransUnion* and many cases, the terms "adverse effects" and "downstream consequences" are used interchangeably. 594 U.S. at 442

22

information creates a 'real' harm with an adverse effect.") (cleaned up). In short, "a statutory violation absent a concrete and adverse effect does not confer standing." *Id.* at 346.

The Foundation undoubtedly will argue that it need not show downstream consequences based on *Federal Election Commission v. Akins,* 524 U.S. 11 (1998) and *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989). But for at least three reasons, those cases do not excuse a showing of downstream consequences for an informational injury.

First, *TransUnion* and other controlling precedent unequivocally require a plaintiff to show adverse effects over and above any statutory violation without stating any exceptions. *See TransUnion,* 594 U.S. at 442; *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) ("[W]e have never held a litigant who asserts [a procedural] right is excused from demonstrating that it has a concrete interest that is affected by the deprivation of the claimed right.") (cleaned up).

Second, the plaintiffs in *Akins* and *Public Citizen* established a "deprivation of information that adversely affected [their] conduct," meaning they did have a concrete injury, as distinguished from one who

has "failed to demonstrate how [the information deprivation] adversely affected his conduct in any way." *Dreher,* 856 F.3d at 346-47.

Third, the adverse effects shown by the *Akins* and *Public Citizen* plaintiffs were "the type of harm *Congress sought to prevent* by requiring disclosure" under the statutes at issue in those cases. *Id.* at 345-46 (cleaned up), which is not the situation with the Foundation. *See* discussion *infra* Section 2.

**C.  *The Foundation's allegations of downstream injury are not adequate to establish Article III standing.***

Thus, the Foundation was required to show downstream consequences from not receiving the voter list as a necessary element of its claim for an informational injury. Although the Foundation did attempt to allege downstream consequences, those allegations are facially insufficient to meet its burden to establish standing. The Court therefore should hold that the Foundation lacks standing.

(1)  *The Complaint contains only superficial allegations insufficient to establish any downstream injury.*

The Foundation alleges in its Complaint that it "seeks to promote the integrity of the electoral process nationwide through research, education, remedial programs, and litigation" and it "regularly utilizes

[§ 20507(i)(1)] and state and federal open records laws that require government records be made available to the public." Compl. ¶ 3 (JA 009). It alleges that "it uses voter list data, "to produce and disseminate reports, articles, blog, and social media posts, and newsletters in order to advance the public education aspect of its organizational mission." Compl. ¶¶ 3, 27 (JA 009, JA 014).

The Foundation also claims to suffer various downstream consequences from the information deprivation. Generally speaking, these claims can be divided into three categories:

- First, the Foundation complains that not having the South Carolina voter list causes it to divert resources from other activities. *See* Compl. ¶¶ 31-32 (JA 014).

- Second, the Foundation complains that not having the South Carolina voter list causes the frustration of its organizational mission. *See* Compl. ¶¶ 33-34 (JA 015)

- Third, the Foundation complains that not having the South Carolina voter list is preventing it from investigating whether South Carolina election officials are complying with the

NVRA and other statutes. *See* Compl. ¶¶ 29-30, 35 (JA 014-016).

The Commission denied the allegations and asserted the Foundation's lack of standing as an affirmative defense. Answer ¶¶ 3, 26-27, 29-35, 41-43 (JA 024-025, JA 032-035). And, although joint stipulations of fact were entered into by the parties, none of these stipulations addressed any downstream consequences for the Foundation. *See* Stipulation (JA 049-054). The question then is whether the Foundation's superficial allegations are sufficient to establish standing.

(2)    *As a matter of law, the Foundation's allegations of diversion of resources, frustration of its mission, and prevention of its ability to investigate compliance with the law are insufficient to establish an actual Article III injury.*

The Foundation's downstream consequences allegations "simply fail[ ] to allege facts upon which [standing] can be based." *Beck,* 848 F.3d at 270 (cleaned up). Even accepting for these purposes that the well-pleaded facts relating to the Foundation's claimed downstream consequences are true, they are insufficient to invoke standing under the Supreme Court's *Hippocratic Medicine* decision and other controlling law.

26

As noted above, the majority of the Foundation's downstream consequences baldly allege that not having the South Carolina voter list is causing a Virginia-based organization to divert resources from other activities and frustrating the Foundation's mission. Compl. ¶¶ 3, 27, 31-34 (JA 010, JA 014-015). These allegations are nothing more than "naked assertions" and the Court does not even need to consider them. *See Iqbal*, 556 U.S. at 678.

But even assuming that the Foundation survives the initial pleading hurdle, the downstream consequences allegedly flowing from the claimed informational injury do not plausibly allege standing. The Foundation's allegations are no more than an abstract claim that is has been injured and, thus, is not sufficiently concrete to maintain an action in federal court. The entire basis of the action is a claim for a voter list. But an alleged informational injury does not afford the Foundation standing to proceed. The denial of their request for the voter list does not alone establish a particularized or concrete injury and it has identified no common law action that would support its claims of harm.

Moreover, in *Hippocratic Medicine*, the Court held in pertinent part that doctors and medical associations challenging actions by the FDA

lacked standing even though they alleged that the "FDA has 'impaired' their 'ability to provide services and achieve their organizational missions.'" 602 U.S. at 394. The Court held that, to have standing, "a plaintiff must show far more than simply a setback to the organization's abstract social interests." *Id*. (cleaned up). The Court also rejected the medical associations argument that they had standing "based on their incurring costs to oppose FDA's actions." *Id*. This is because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id*.

So it is here. The Foundation vaguely alleged injuries that it will be forced to divert resources and its nationwide organizational activities will be impaired by not receiving the South Carolina voter list. But the Foundation's allegations are functionally indistinguishable from those rejected in *Hippocratic Medicine*, and as a matter of law, do not support standing. Moreover, there is no common law analogue that would support the Foundation's standing. In sum, the Foundation has made no

allegations demonstrating that it has suffered a concrete and particularized injury that is real and not abstract. Its case should be dismissed.

(3)    *The Foundation's representations during oral argument factually contradict that it has adequately alleged downstream consequences or an injury in fact.*

Furthermore, based on its representations to the Court, the Foundation has suffered no downstream consequences and no injury-in-fact. At the hearing, the district court observed to the Foundation that "you could walk out of here on the sidewalk and get the first registered voter who walks by and give him $10 and say, 'Go request a Voter Registration List for us,' and you could get it. *So you could get it indirectly. But you say that the principle is more important*, your organization wants these records . . . ." Tr. at 7:06-12 (JA 069) (emphasis added). To this, the Foundation replied "*Indeed, we could do as you suggest*, we could walk and get somebody else or maybe one of the students to get this for us, but, number one, that isn't what Congress intended or wrote in the plain text of the statute. It said anybody can do it. It doesn't say only registered voters in South Carolina." Tr. at 7:24-8:04 (JA 069-070) (emphasis added).

In other words, the Foundation admitted that it was suing for the South Carolina voter list to make a point or for other abstract reasons, but not to address an actual problem, let alone any "harm that is [ ] certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013). This is not enough. To maintain this action, the Foundation must be "aggrieved," 52. U.S.C.A. § 20510(b) and their ability to otherwise obtain the voter list means they are not. Moreover, in *Opiotennione v. Bozzuto Management Co.*, 130 F.4th 149, 156 (4th Cir. 2025), this Court recently found no "concrete and particularized denial of information" in part because the information was "easily accessible to [plaintiff] in other ways." Additionally, the Foundation cannot "manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. In sum, the Foundation has not demonstrated that is has suffered a concrete, de facto injury. *Dreher*, 856 F.3d at 344 ("A concrete injury [must be] de facto, meaning that 'it must actually exist.") (cleaned up).

(4)     *The Foundation's stated purposes for using the voter list does not fit within the ambit of the NVRA.*

As discussed *supra*, for an informational injury to be a concrete, it must be "the type of harm Congress sought to prevent by requiring

30

disclosure" under the statute at issue. *Dreher,* 856 F.3d at 345-346 (cleaned up). Or, stated differently, the injury must have "impaired" plaintiff's "ability to use the information for a substantive purpose that the statute envisioned." *Casillas*, 926 F.3d at 338 (cleaned up). *Akins* and *Public Citizen* both involved disclosure statutes, based on which those plaintiffs alleged concrete harms stemming from their information deprivation. Not so with the Foundation and the NVRA. Thus, as an independent basis for finding against standing, assuming that the voter list must be disclosed, the Foundation does not allege any harms within the ambit of the statute.

The predominant purpose of the NVRA was to ease barriers to voting. *Condon v. Reno*, 913 F. Supp. 946, 954 (D.S.C. 1995). The Foundation has never alleged that it is representing any voters, and regardless, the Foundation is an organization which cannot vote. Albeit not in the context of an NVRA preemption challenge, the Court has recently recognized state voter lists as being "closely tied to political speech." *Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (upholding substantially similar state law restricting dissemination of the list on

constitutional challenge). But as an IRC § 501(c)(3) organization, the Foundation is prohibited from any political activity.

The Foundation claims its work fits within two secondary purposes of the NVRA, "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained," 52 U.S.C.A. § 20501(b)(3), (4). However, these statutory objectives like the statute as a whole were also designed to help voters, and there is neither evidence nor legislative history demonstrating that Congress contemplated the fulfilment of these purposes through an organization like the Foundation that claims to be acting as a private inspector general.

## D. *Summary of the Commission's arguments.*

The Foundation has at all times the burden to prove standing, and it cannot meet that burden merely by alleging a statutory violation. And although the Foundation did facially allege downstream consequences purportedly arising from that violation, those allegations are not sufficient to establish a concrete injury in fact necessary to establish this Court's Article III jurisdiction. Finally, the Foundation's alleged injury does not have close relationship to any harms traditionally recognized as

providing a basis for a lawsuit in American courts. The Court should hold that the Foundation lacks standing.

**2. The Foundation is not entitled to the voter list because the list of eligible state voters is not a "record[ ] concerning the implementation of programs and activities" for which disclosure is required by § 20507(i)(1).**

By failing to give full weight to all of the statutory language, the district court erroneously determined that § 20507(i)(1) requires giving the Foundation the voter list. Assuming without conceding that the Court has jurisdiction, § 20507(i)(1) entitles the Foundation to obtain the voter list only if it "concern[s] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The court correctly recognized that the voter list "is properly classified as an output of all other records or reports which the [Commission] utilizes to add or remove voters." Order at 9 (JA 102). Nevertheless, the court found that the Foundation is entitled to the list by placing undue emphasis on the statutory term "concerning" while ignoring the phrase "implementation of programs and activities conducted for the purpose of." Order at 8 (JA 101) ("Put simply, the NVRA is a broad statute which covers all records 'concerning' efforts made to maintain an accurate and current list of eligible voters.").

In so doing, the court relegated to superfluity the clauses "implementation of programs and activities" and "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024) ("Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are 'superfluous' or 'void' of significance."); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."). This was error.

A.   *The unambiguous terms and phrases "implementation," "program," "activity," and "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" all have meaning and limit § 20507(i)(1)'s coverage to records "concerning" the actions regulated by § 20507.*

A record is not subject to § 20507(i)(1) unless it concerns the implementation of a program or activity.

> The preeminent canon of statutory interpretation requires us to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." . . . Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous.

*Bedrock Ltd., LLC v. U.S.*, 541 U.S. 176, 183 (2004). When interpreting a statute, a court's starting point is "a careful examination of the ordinary meaning and structure of the law itself" and if the examination yields a clear answer, the court must stop. *Food Mktg. Inst. v. Argus Leader Media,* 588 U.S. 427, 436 (2019) (cleaned up). The disclosure language of § 20507(i)(1) is clear and unambiguous.

The words "implementation," "program," and "activity" are not defined in the NVRA. When a word in a statute is undefined, the courts give it its ordinary meaning. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). A review of the ordinary meaning of each of these terms demonstrates the error by the lower court.

The term "implementation . . . generally refers to the taking of actions that are designed 'to give practical effect to and ensure actual fulfillment of by concrete measures.'" *City & Cnty. of San Francisco, California v. Env't Prot. Agency*, 604 U.S. ___, 145 S. Ct. 704, 715 (2025) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1134 (1976)). The *San Francisco* decision illustrates how "implementation" operates in a statute based on its plain meaning.

At issue in *San Francisco* was 33 U.S.C.A. § 1311(b)(1)(C), which requires the EPA to "impose requirements to 'implement' water quality standards." *Id.* Petitioners challenged EPA permits that simply made them responsible for water quality without telling them what to do to achieve that result. *Id.* The Court held that § 1311(b)(1)(C) did not authorize EPA's actions because "[s]uch a directive simply states the desired result; it does not implement that result." *Id.* at 716. Thus, a statute's use of "implementation" requires focusing on the steps to achieve a result, not the result itself.

So it is here. The statutory phrase at issue is "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The steps the Commission takes to achieve "ensuring the accuracy and currency of official lists of eligible voters" are measured by the "programs and activities" the Commission implements. The word "program" is defined as "a schedule or system under which action may be taken toward a desired goal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1812 (2002). The word "activity" is defined in pertinent part as "an

organizational unit for performing a specific function *also* : its duties or function." *Id.* at 22.

The district court placed undue emphasis on the use of "all records." While "all records" is a broad noun phrase, its reach is narrowed by the prepositional phrase "concerning the implementation of programs and activities." *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) (noting that a limiting clause or phrase generally modifies the immediately adjacent noun or phrase); *see also Concerning*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 470 (2002) (defining the term as a preposition meaning "relating to: Regarding, Respecting, About"). And the "programs and activities" the Commission implements is further limited by the clause "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." Thus, the plain language of § 20507(i)(1) limits the records subject to disclosure to those programs and activities "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." In other words, assigning all the words and phrases in § 20507(i)(1) an ordinary and customary meaning, Congress intended to only require disclosing records about the steps—"programs and activities"—taken by a state—"implementation"—

to ensure that the voter list is accurate and current. The voter list is not a program or activity that ensures that the list is accurate and current.

Concluding that § 20507(i)(1) does not require disclosing the voter list makes sense because the list is the output of the required programs and activities. That is consistent with the focus of § 20507, which requires states to take certain actions to ensure voter lists are accurate, such as the procedures for removing names of voters. *E.g.*, § 20507(c) (defining voter removal programs), (d) (establishing parameters for removing names from voter rolls), (f) (changing address), & (g) (removing convicted felons). The statute also imposes protections to ensure that voters are not improperly removed. § 20507(a)(3) & (4) (removal for death or change in address), (b)(2) (defining parameters for removing someone for failing to vote).

Viewed in this light, § 20507(i)(1) is properly read as requiring states to disclose records about implementing the programs and activities § 20507 mandates to ensure the accuracy and currency of the voter lists; it is not a general disclosure statute allowing access to any voting record that someone wants a state to produce. *Cf. TransUnion*, 594 U.S. 412, 441 (explaining that the Fair Credit Reporting Act, which requires

disclosing certain credit-related information, is not a public-disclosure law). And, significantly, neither § 20507 nor the NVRA as a whole imposes voter list requirements on states. Rather, voter list requirements are imposed by HAVA. § 21083(a)(1)(A) ("[E]ach State . . . shall implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . at the State level."). And HAVA contains no disclosure requirement analogous to the NVRA's § 20507(i)(1) and no private right of action. *Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, 127 F.4th 534, 536 (4th Cir. 2025). Thus, the required disclosure of records outside of those encompasses by the clear and unambiguous language of § 20507's language is left to state law—just as the Commission has consistently argued. *See also* discussion *infra* Part 3.

**B.    *The district court erred by ignoring the ordinary meaning of all of the words and clauses in § 20507(i)(1) in favor of relying only on the term "concerning."***

Read plainly and in context, § 20507(i)(1) requires inspection of records about adding and removing voters from a voter list and does not govern access to the voter list itself. The district court correctly recognized that the list is not itself a record of a § 20507 program or

activity, expressly finding that the voter list is the "output" or "end-product of the State's list maintenance activities." Order at 9 (JA 102). The Commission respectfully submits that finding should have been the end of the analysis based on the plain statutory language. But the court erred by proceeding to find that the voter list is a record "concerning" the State's § 20507 programs and activities without focusing on the language "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See* Order at 9 (JA 102) ("[T]he [voter list] represents the end-product of the State's list maintenance activities. Thus, the [list] concerns those maintenance activities.").

This was error because, to be part of "all records" subject to § 20507(i)(1), a document must "concern[ ] the implementation of programs and activities"; i.e., it must "concern[ ]" the steps taken to achieve a result—ensuring the voter list is accurate and current. The voter list does not provide any information about the actual steps taken to ensure that the list is accurate and current. *See* Leach Aff. ¶¶ 17-18 (JA 061).

The district court's erroneous analysis was driven by its conclusion that § 20507(i)(1) reaches broadly based only on the word "concerning."

Order at 8 (JA 101) ("Put simply, the NVRA is a broad statute which covers all records 'concerning' efforts made to maintain an accurate and current list of eligible voters."). Although the phrase "all records concerning" is, standing alone, broad, it must be interpreted in context, *see San Francisco*, 2025 WL 676441 at 7, which requires disclosure only of "records concerning the implementation" of § 20507 programs and activities. *See also New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere. But that, of course, would be to read Congress's words of limitation as mere sham.") (cleaned up).

In relying only on the phase "all records concerning" in construing § 20507(i)(1), the district court's analysis ignores the limitation imposed by the statute's use of the terms and phrases "implementation," "programs," "activities" and "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." Although the objective of the activities is, as contemplated by § 20507, an accurate and current voter list, that list is the end result and is not a record about

implementing anything. By requiring disclosure of the list, the court erred by failing to limit disclosure to the programs and activities the Commission implemented to ensure an accurate and current voter list, as the unambiguous language of the § 20507(i)(1) requires. The lower court effectively applied the statute as if it read "all records concerning . . . official lists of eligible voters" instead of giving import and meaning to all of the statutory language ."

**C.** ***The district court erred in concluding that this Court's Project Vote decision required the determination it reached and also erred in finding the First Circuit's Bellows decision persuasive.***

This Court's *Project Vote* decision does not change this conclusion. At issue in *Project Vote* was the plaintiff's right to access voter registration applications under § 20507(i)(1). This Court held that the state's review of voter registration applications was "a 'program' because it [was] carried out in the service of a specified end—maintenance of voter rolls—and it [was] an 'activity' because it is a particular task and deed of Virginia election employees." 682 F.3d at 335 (cleaned up). The Court thus held that the voter registration applications were "clearly records concerning the implementation of this program and activity," because

they are "the means by which an individual provides the information necessary for the Commonwealth to determine his eligibility to vote." *Id.*

Because receiving and evaluating voter registrations is the implementation of an activity required by § 20507, *Project Vote* correctly held that § 20507(i)(1) requires disclosing those records. But, foreshadowing *San Francisco*, this Court considered whether the forms concerned the implementation of a program or activity within the meaning of § 20507(i)(1). Concluding that they did, the Court held that disclosure was required. Just so. But *Project Vote* does not require giving the Foundation the voter list because, in contrast to voter registration forms that are specifically regulated by the NVRA, the voter list is simply the list of registered voters and includes no information about a § 20507 program or activity. Stated another way, unlike voter registration applications, the voter list is not "the means by which an individual provides the information necessary" to the Commission to evaluate the eligibility of voters. *Id.*

The district court also erroneously relied in large part on the First Circuit's *Bellows* decision. *See* Order at 10 (JA 103). *Bellows* is the only

appellate decision to decide whether a list of voters[4] is covered by § 20507(i)(1). The First Circuit also misread § 20507(i)(1) as a broad statute without reference to its actual language and erroneously held that it encompassed Maine's voter list. The Commission contends that the First Circuit erred in its analysis because, like the district court, *Bellows* essentially reads "implementation," "programs," "activities" and the limiting "ensuring" clause out of the statutory language by holding that the list was subject to disclosure as the end result of the registration process. *See Bellows*, 92 F.4th at 47-48. Both the *Bellows* court and the district court erred by reading § 20507(i)(1) to exclude the limiting language regarding the records subject to disclosure. *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 770 (2019) ("Really, to accomplish all it wants, Virginia Uranium would have to persuade us to read 13 words out of the statute and add 2 more . . . . That may be a statute some would prefer, but it is not the statute we have.") (plurality opinion).

---

[4] Two other district courts have considered whether a voter list or similar document falls within § 20507(i)(1): *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932 (C.D. Ill. 2022) and *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019). The Commission contends these decisions were erroneous for the same reasons the district court and the *Bellows* court erred.

**D.**  *Summary of the Commission's arguments.*

Although the Foundation may be entitled to "all" records contemplated by § 20507(i)(1), it first is necessary to determine what records are subject to the disclosure provision. For the reasons discussed above, the voter list is not one of those records because it does not concern the "implementation of programs and activities." Rather, it is the end result of that process and, as such, cannot be properly described as the implementation of anything under the NVRA, since the voter list—the end result—is regulated by HAVA. While the Foundation may be interested in that document, § 20507(i)(1) does not entitle it to receive it as a matter of federal law. The district court erred in concluding otherwise and the Commission was entitled to summary judgment in its favor.

**3.** Even assuming that the list of eligible state voters is a "record[ ] concerning the implementation of programs and activities" under § 20507(i)(1), the district court erred in finding that the South Carolina statute governing disclosure of the state's list is preempted by either the Elections Clause or the Supremacy Clause.

**A.** *The district court erred in concluding that § 20507(i)(1) preempts § 7-3-20(D)(13)'s qualified elector restrictions because the Elections Clause does not extend that far and because neither § 7-3-20(D)(13) nor § 20507(i)(1) are directed to the "Times, Places and Manner of holding elections.*

The district court erred in concluding that, as the Foundation contended, § 7-3-20(D)(13) is preempted by the Elections Clause and the Supremacy Clause. The Elections Clause provides as follows:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

U.S. CONST. art. I, § 4, cl. 1. As this Court has recognized, "[u]nder this scheme, the states 'have a major role to play in structuring and monitoring the election process, including primaries.'" *Sharma v. Hirsch*, 121 F.4th 1033, 1037 (4th Cir. 2024) (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572) (2000)). But the Elections Clause does not require uniform practices across the United States, leaving "broad power" with the states to regulate elections. *Id*. at 1038 (cleaned up)

(characterizing federalist compromise as "an acknowledgement that state governments were well equipped to respond to the needs of their electorates).

The district court determined that the Elections Clause endowed § 20507(i)(1) with preemptive power over § 7-3-20(D)(13), stating that the "'assumption that Congress is reluctant to pre-empt does not hold when Congress acts' under that clause." Order at 14 (JA 107) (quoting *Arizona v. Inter Tribal Council of Az., Inc.*, 570 U.S. 1, 14 (2013)). But in doing so, the court erroneously extended the preemptive effect of § 20507(i)(1) into an area that states have continuing authority. The state statute can readily operate in conjunction with § 20507(i)(1) in that it allows access to the voter list beyond that contemplated by § 20507(i)(1), but restricts that access to registered state voters in order to provide some enforceable protections over the use of that list.

Perhaps more importantly, the Elections Clause preemption analysis should not apply because neither § 7-3-20(D)(13) nor § 20507(i)(1) constitute a regulation of the "Times, Places and Manner" of holding elections because neither involve the procedural mechanisms for holding elections. *See Cook v. Gralike*, 531 U.S. 510, 523 (2001); *cf.* S.

Rep. 103-6, at 3 (1993) ("[The NVRA] seeks to remove the barriers to voter registration and participation under Congress' power to enforce the equal protection guarantees of the 14th Amendment to the Constitution."). The Foundation argued and the district court considered but ultimately did not apply the Supremacy Clause, which provides that the "Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The court noted the presumption against preemption that arises when questions arise under the Supremacy Clause, and considered the nature of the preemptive conflict as must be done under that clause, but ultimately determined that the presumption against preemption does not apply because the Elections Clause controls. Order at 13 (JA 106).

The district court should have granted the Commission's motion for summary judgment on the preemption issue. In § 7-3-20(D)(13), the State has regulated who may obtain its list of voters; in § 20507(i)(1), Congress has merely identified the records that must be made available. Neither statute governs the conduct of elections or registration to participate in those elections. Consequently, § 20507(i)(1) is not a "Times, Places and Manner" regulation and does not presumptively operate to displace state laws on the same subject. *See Inter Tribal*, 570 U.S. at 14 ("When

Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States."); *see also N. Virginia Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025) ("But under the federalism principles baked into the Constitution, states are separate sovereigns. So, we apply the Supremacy Clause with the basic assumption that Congress did not intend to displace state law.") (cleaned up). By failing to apply the conflict preemption analysis, the court erred in concluding that § 7-3-20(D)(13) is preempted by § 20507(i)(1).

## B. *The district court erred in failing to evaluate preemption in light of whether § 20507(i)(1)'s disclosure requirements are a "significant objective" of the NVRA.*

Viewed in this light, the district court should have granted summary judgment to the Commission because there is no conflict between operation of the federal and state statutes. Conflict preemption only applies when a state law "actually conflicts" with federal law. *Dalton v. Little Rock Family Planning Servs.,* 516 U.S. 474, 476 (1996). This actual conflict may arise when the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Virginia Uranium, Inc. v. Warren*, 848 F.3d 590, 594 (4th Cir. 2017).

"Determining whether a state law stands as an obstacle to federal law is a two-step process. First, [courts] determine Congress's 'significant objectives' in passing the federal law." *Id.* at 599 (cleaned up). Courts "then turn to whether the state law stands as an obstacle to the accomplishment of a significant federal regulatory objective." *Id.* (cleaned up).

"In [preemption analysis], as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Virginia Uranium*, 587 U.S. at 765. "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Id.* at 767 (cleaned up).

Here, a review of the statutory text and the scant legislative history concerning § 20507(i)(1) does not even reveal a suggestion that disclosure of voter registration activities was a "significant objective" of Congress.

The Conference Reports on the NVRA only recite the text of § 20507(i)(1) and certainly express no Congressional intent to preempt. *See* H.R. Rep. No. 103-9, § 8, at 12-13 (1993); S. Rep. No. 103-6, § 8, at 22-25 (1993). Without evidence of any Congressional intent in the text or legislative history, there is nothing on which the Court can base a finding that Congress considered disclosure a "significant objective." *See English v. Gen. Elec. Co.*, 496 U.S. 72, 89 (1990) ("Absent some specific suggestion in the text or legislative history of § 210, which we are unable to find, we cannot conclude that Congress intended to pre-empt all state actions that permit the recovery of exemplary damages."). In short, it is not enough "for any party or court to rest on a supposition (or wish) that 'it must be in there somewhere.'" *Virginia Uranium,* 587 U.S. at 767.

**C.** **S.C. Code § 7-3-20(D)(13) is not preempted because it is no obstacle to the accomplishment of a significant federal regulatory objective of the NVRA and, therefore, the Commission can limit distribution of the voter list to qualified South Carolina electors.**

Because § 20507(i)(1) is not a "significant objective" of the NVRA, the district court's finding that § 7-3-20(D)(13)'s disclosure restriction is preempted by the NVRA was erroneous because the state statute is not "an obstacle to the accomplishment of a significant federal regulatory

objective." *Virginia Uranium, Inc.*, 848 F.3d at 599 (cleaned up). That is especially so here because the focus of § 20507(i)(1) is the disclosure of "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See* § 20507(i)(1).

This case is not even about the actual activities of ensuring the accuracy and currency of official lists of eligible voters, but *records concerning* such activities. Even if determined to fall within the parameters of § 20507(i)(1), the document is not of the same nature as are voter registration applications themselves and other records that are directly involved in the actual "implementation of programs and activities" as expressly stated by the NVRA. Stated another way, even if disclosure of the voter list was contemplated by the NVRA, the disclosure of records that are the product of the § 20507 "programs and activities" is not a significant objective of the statute. *See Guthrie v. PHH Mortgage Corp.,* 79 F.4th 328, 341-42 (4th Cir. 2023) ("States are separate sovereigns that should have the freedom, at least generally, to create causes of action as they see fit. While preemption limits this freedom, we do not presume preemption. And we likewise should not seek out conflicts

between state and federal regulation where none clearly exists.") (cleaned up).

Another reason that § 20507(i)(1) also does not preempt § 7-3-20(D)(13) is that Congress's objectives are in no way frustrated by the Commission allowing the more than three million South Carolina voters in this State, if they choose, the option of publicly accessing their own state's voter list. The fact that a state statute that was passed 26 years before the NVRA, and which operates independently of the NVRA, prevents an out-of-state corporation from receiving the voter list in no way lessens the fulfillment of disclosure. This is particularly true given the voter list's disconnection from any activity contemplated within § 20507(i)(1), but the conclusion remains even if the Court finds the voter list is a § 20507(i)(1) record.

The NVRA also does not preempt § 7-3-20(D)(13) because the Commission allows public access through the provision of electronic files at the requestor's choosing. In fact, the Foundation's § 20507(i)(1) request asked the Commission to "reproduce or provide [the Foundation] the opportunity to inspect the statewide voter registration list as described in S.C. Code § 7-5-186." Compl., Ex. A (JA 018). Because the plain

language of § 20507(i)(1) only authorizes public access to covered documents either in the form of public inspection or of photocopying and contains no limitations on the method used by a state to provide information, § 7-3-20(D)(13) allows for and the Commission provides greater access than required by the NVRA. *Project Vote,* 682 F.3d at 336 (holding that "because [the applicable documents] . . . are covered by § 20507(i)(1)'s general mandate [ ] they must be made available for public inspection and . . . photocopying") (cleaned up); *see also Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324, 1332-34 (11th Cir. 2024) (analyzing inspection and photocopying language of § 20507(i)(1)). There is no language in § 20507(i)(1) or anywhere else in the NVRA that circumscribes the method used by a state to comply with the disclosure section or to prohibit it from charging a reasonable fee for providing the voter list.[5]

---

[5] Based on the district court's Order on reconsideration, the question of whether the NVRA preempts the state requirement that the Commission collect a "reasonable fee" for providing the voter list is not at issue in this case. *See* Recons. Order at 4 (JA 114). Similarly, the district court also ruled that the question of preemption of the state statutes regarding disclosure of a voter's social security number, S.C. Code Ann. §§ 7-5-170(1) & 30-2-310(A)(1)(e), and prohibiting use of the list for commercial solicitation, S.C. Code Ann. § 30-2-50, are not at issue in this case due to concessions made

**D.**    *Summary of the Commission's arguments.*

The district court erred by concluding that § 20507(i)(1) preempts the qualified elector provisions of § 7-3-20(D)(13). The question is, as the court identified, whether the state statute is preempted by the Supremacy Clause. Because the disclosure statute is not a time, place, or manner regulation and because disclosure was not a significant Congressional objective, the district court erred by failing to determine that there is no conflict preemption of § 7-3-20(D)(13) by § 20507(i)(1).

## Conclusion

The Commission respectfully requests that this Court hold that the Foundation lacks standing. Should the Court conclude that the Foundation does have standing, the Commission requests that the Court hold that § 20507(i)(1) does not encompass the list sought by the Foundation or, alternatively, that the statute does not preempt § 7-3-20(D)(13)'s restrictions on dissemination of the list.

---

by the Foundation. *Id.* (JA 114). The court determined that ruling on those issues would be "tantamount to issuing an advisory opinion." *Id.* (JA 114). The Commission accepts the district court's ruling and notes that those statutes will remain in effect regardless of the outcome of this appeal.

## Request for Oral Argument

Pursuant to Local Rule 34(a), the Commission respectfully requests oral argument. This appeal presents a number of interrelated issues and several novel questions of law. The Commission believes that oral argument will greatly assist the Court in distilling the relevant legal and factual issues and therefore substantially aid the decisional process.

Respectfully submitted,

*s/Tracey C. Green*
Mary Elizabeth Crum
Tracey C. Green
Michael R. Burchstead
BURR & FORMAN LLP
PO Box 11390
Columbia, SC 29211
(803) 799-9800
lcrum@burr.com
tgreen@burr.com
mburchstead@burr.com

Thomas W. Nicholson
State Election Commission
1122 Lady Street, Suite 500
Columbia, SC 29201
(803) 734-9063
tnicholson@elections.sc.gov

*Counsel for Defendant-Appellant Howard M. Knapp, in his official capacity as Executive Director of the South Carolina Election Commission*

April 7, 2025
Columbia, South Carolina

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 25-1128     Caption: Public Interest Legal Foundation v. Howard M. Knapp

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____11,339____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
14-point Century Schoolbook _____ [*identify font, size, and type style*];

**or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Tracey C. Green _____

Party Name Appellant Howard M. Knapp _____     Date: April 7, 2025 _____