CASE NO. 25-1128

---

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

Public Interest Legal Foundation,

> *Plaintiff-Appellee*,

v.

Howard M. Knapp, in his official capacity as Executive Director of the South Carolina Election Commission,

> *Defendant-Appellant.*

On Appeal from the United States District Court
for the District of South Carolina at Columbia
Docket No. 3:24-cv-1276-JFA

---

**BRIEF OF *AMICUS CURIAE*
REPUBLICAN NATIONAL COMMITTEE
IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

---

Lee E. Goodman (VA31695/DC435493)
Michael A. Columbo (DC 476738)
Josiah Contarino (DC NY0612)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
415-433-1700
lgoodman@dhillonlaw.com
mcolumbo@dhillonlaw.com
jcontarino@dhillonlaw.com

# CORPORATE DISCLOSURE STATEMENT

No. __25-1128__    Caption: Public Interest Legal Foundation v. Howard M. Knapp

Pursuant to FRAP 26.1 and Local Rule 26.1,

Republican National Committee
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?    ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Lee E. Goodman                Date:   May 12, 2025

Counsel for: Republican National Committee

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................ii

TABLE OF CONTENTS.......................................................................iv

TABLE OF AUTHORITIES ..................................................................v

INTEREST OF *AMICUS CURIAE* ......................................................1

INTRODUCTION ...................................................................................3

ARGUMENT ...........................................................................................7

I.  The Text of the NVRA Shows that It Was Enacted to Ensure Fairness and Transparency in Voter Registration. ...................7

II.  The Legislative History of the NVRA Confirms that It Was Enacted to Ensure Fairness and Transparency in Voter Registration. ........................................................................... 12

III. Case Law Interpreting the NVRA Shows that It Was Enacted to Ensure Fairness and Transparency in Voter Registration—And to Hold State Registration Efforts Accountable. ........................................................................... 14

IV. Government Transparency, Especially Vis-à-vis Elections, is Key to Public Trust in Government. ....................................... 16

V.  Unfortunately, Some State Public Records Laws Are Weaponized to Restrict Public Access to Voter Registration Information. ........................................................................... 19

VI. The District Court's Decision Upholds Congress's Transparency Objectives and Supports Democratic Engagement and Public Confidence. ....................................... 23

CONCLUSION .....................................................................................25

CERTIFICATE OF SERVICE..............................................................26

CERTIFICATE OF COMPLIANCE WITH FRAP 29 AND 32 ...........26

iv

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ...................................................................... 17, 18

*Husted v. A. Randolph Inst.*,
  584 U.S. 756 (2018) ........................................................................... 3

*In re Oliver*,
  333 U.S. 257 (1948) .......................................................................... 18

*Judicial Watch, Inc. v. Adams*,
  No. 3:17-cv-00094-GFVT-EBA (E.D. Ky. March 28, 2025) .................. 3

*Lamar, Archer & Cofrin, LLP v. Appling*,
  584 U.S. 709 (2018) ........................................................................... 9

*Life Partners, Inc. v. Morrison*,
  484 F.3d 284 (4th Cir. 2007) ............................................................ 10

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers*,
  514 U.S. 645 (1995) .......................................................................... 10

*Nat'l Archives & Recs. Admin. v. Favish*,
  541 U.S. 157 (2004) .......................................................................... 17

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v.*
  *Allen*,
  152 F.3d 283 (4th Cir. 1998) ............................................................ 10

*Patel v. Garland*,
  596 U.S. 328 (2022) ........................................................................... 9

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ........................................... 10, 14, 15, 24

*Project Vote/Voting for America, Inc. v. Long*,
  752 F. Supp. 2d 697 (E.D. Va. 2010) ............................................... 16

*Pub. Int. Legal Found. v. Knapp,*
  749 F.Supp.3d 563 (D.S.C. 2024) ...................................... 10, 14, 21, 23

*Pub. Int. Legal Found., Inc. v. Bellows,*
  92 F.4th 36 (1st Cir. 2024) ...................................................... 13, 15, 22

*Pub. Int. Legal Found., Inc. v. Simon,*
  No 24-cv-01561 (SRN/DJF), 2025 WL 835818 (D. Minn. Mar. 17,
  2025) ...................................................................................................... 21

*Shaw v. Delta Air Lines, Inc.,*
  463 U.S. 85 (1983) ................................................................................ 10

*Smith v. Doe,*
  538 U.S. 84, 99 (2003) .......................................................................... 18

*Sullivan v. Summers,*
  No. MJM-24-172, 2025 WL 696549 (D. Md. Mar. 4, 2025) ..... 10, 14, 22

**Statutes**

52 U.S.C. § 20501(a) ....................................................................................... 7

52 U.S.C. § 20501(b) .................................................................................... 7, 8

52 U.S.C. § 20507 ............................................................................................ 8

52 U.S.C. § 20507(i)(1) ............................................................................... 5, 8

52 U.S.C. § 21083(a)(1)(A) .......................................................................... 11

52 U.S.C. § 21083(a)(1)(A)(vi) .................................................................... 11

52 U.S.C. § 21083(a)(4) ................................................................................ 11

52 U.S.C. § 21083(a)(5)(B)(i) ...................................................................... 11

52 U.S.C. § 30101(14) ..................................................................................... 1

52 U.S.C. §§ 20501–20511 ............................................................................. 7

52 U.S.C. §§ 20901–21145 ........................................................................... 11

vi

Ala. Code § 36-12-40(a) ............................................................... 20

Ark. Code. § 25-19-105 ............................................................... 20

Del. Code tit. 29, § 10003(a) ...................................................... 20

Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 (2002) ..... 11

Minn. Stat. § 201.091, Subds. 4(a), 5 ....................................... 21

Minn. Stat. §§ 13.01, Subd. 10, 13.03, Subd. 3(a) .................................. 21

N.J. Stat. Ann. § 47:1A-1 ........................................................ 20

National Voter Registration Act, Pub. L. No. 103-31, 107 Stat. 77 ......... 7

S.C. Code Ann. § 7-3-20(D)(13) ................................................ 21

Tenn. Code § 10-7-503 ............................................................ 20

Va. Code §2.2-3704(A) ............................................................. 20

**Other Authorities**

Margaret B. Kwoka, *Saving the Freedom of Information Act* (2021) ..... 19

Note, *Legal History: Origins of the Public Trial,* 35 Ind. L.J. 251, 251 (1960) ................................................................................ 18

Rebecca Green, *FOIA-Flooded Elections*, 85 Ohio St. L.J. 255 (2024) .. 17, 19

Rep. No. 101-140, at 13 (1989) ................................................ 13

S. Rep. No. 103-6, at 18 (1993) ............................................ 12, 13

**Constitutional Provisions**

U.S. Const. art I, § 4 ............................................................... 3

## **INTEREST OF *AMICUS CURIAE***[1]

The Republican National Committee ("RNC") is the national
organization of the Republican Party, representing Republican voters
and candidates nationwide, as defined by 52 U.S.C. § 30101(14). The
RNC helps Republican candidates achieve electoral victories at the
local, state, and national levels. It engages in party-building activities;
registers voters; gets out the vote; assists state and local parties;
recruits, nominates, and supports candidates; holds conventions; adopts
a national platform; supports voting rights and election integrity; and
advocates for policies and issues aligned with the Republican Platform.

The RNC is committed to a fair electoral process that ensures both
access to the ballot and election integrity. The RNC believes that active
voter registration and get-out-the-vote programs in combination with
election integrity measures bolster public confidence in the
administration of our elections, which is critical to our democracy.

The starting block for voter participation and election integrity is
voter registration. The RNC and state and local Republican parties

---

[1]      No counsel for a party authored this brief in whole or in part,
and no person other than amicus or its counsel made a monetary
contribution to its preparation or submission.

1

assist thousands of citizens each year in registering to vote and devote substantial resources to get-out-the-vote efforts in reliance upon public voter registration lists. The RNC also monitors election administration to ensure sound voting procedures, accurate election tallies, and public confidence in election outcomes. All these efforts rely upon accurate voter rolls.

Because of the importance of accurate voter registration systems, the RNC recently sent requests for a comprehensive set of voter registration records to 48 states and the District of Columbia, and those requests are currently pending in various stages of response. The RNC's experience is that some states take their responsibility under the National Voter Registration Act of 1993 ("NVRA") more seriously than others. The dispute in this case is consistent with the RNC's experience in seeking public voter registration records from some states.

For these reasons, the RNC has a strong interest in broad transparency of voter registration records under the NVRA, consistent with the lower court's decision.

## **INTRODUCTION**

Adopted pursuant to Congress' authority to regulate federal elections under the Elections Clause of Art. I, Sec. 4 of the Constitution, the NVRA represents a cornerstone of federal electoral reform, designed to expand access to voter registration and ensure the integrity of the electoral process. "The Act has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Randolph Inst.*, 584 U.S. 756, 761 (2018). Yet, the Supreme Court also has acknowledged significant shortcomings in state efforts to fulfill their responsibilities under the NVRA. "It has been estimated that 24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate. And about 2.75 million people are said to be registered to vote in more than one State." *Id.* at 760 (citing Pew Center on the States, Election Initiatives Issue Brief 1 (Feb. 2012)). This has placed the burden on private organizations to remedy substantial inaccuracies in state voter registration rolls. *See, e.g.*, State Bd. of Elections' Notice of Compliance with Consent Decree, *Judicial Watch, Inc. v. Adams*, No. 3:17-cv-00094-GFVT-EBA (E.D. Ky. March 28, 2025) (documenting the

State Board of Elections of Kentucky's removal of over one million inactive voters pursuant to a consent decree). The public thus has an important interest in monitoring state efforts to register voters and maintain accurate voter lists.

Among the NVRA's provisions, Section 8 is the critical mechanism for maintaining accurate voter rolls and public trust in elections. Section 8 balances the complementary goals of expanding voter participation, ensuring election integrity, and fostering public accountability and trust in election administration.

Section 8 of the NVRA requires states to maintain voter registration lists by removing ineligible voters—such as those who have died or moved—while establishing strict guidelines to prevent erroneous or discriminatory removals. Accurate voter rolls prevent problems like disenfranchisement of qualified voters, duplicate registrations and double voting, and votes cast in the name of other voters who no longer reside in the district. All of these problems can undermine the confidence of the qualified electorate in election outcomes. By requiring states to conduct list maintenance in a

systematic and transparent manner, Section 8 promotes administrative competence and election integrity.

Section 8 also requires states to make all records relating to their voter registration practices available to the public. Transparency promotes public accountability, which is another critical objective of the NVRA. The law requires states to make all records relating to their voter registration practices available to the public. This transparency is essential for building public confidence in the electoral process. When citizens can trust and verify that voter rolls are maintained fairly and accurately, they are more likely to participate in elections, knowing their votes will be counted and their voices heard.

The lynchpin for that trust is Section 8's requirement that states maintain for at least two years and make available to the public "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Once states start refusing public requests for those records—like South Carolina did here—public trust erodes.

5

The administrative effort required of states to register voters, maintain lists, and make registration records accessible in compliance with Section 8's mandates, is a necessary investment in electoral participation, election integrity, and public accountability. Moreover, the NVRA's penalties for noncompliance incentivize states to implement robust systems, ensuring that the law's goals are met without compromising efficiency.

Section 8 of the NVRA is a vital tool for promoting good government, transparency, and democracy. Its requirements for accurate, fair, and transparent voter list maintenance ensure that elections are both accessible and trustworthy. After over 20 years since its enactment, Section 8 remains an indispensable safeguard, embodying the principles of fairness and accountability that define a healthy democracy.

In contravention of these clear legal requirements, South Carolina's State Election Commission denied a request by the Public Interest Legal Foundation ("PILF" or "Plaintiff-Appellee") for a copy of its statewide voter registration list. South Carolina asserts that it is not required by the NVRA to provide a copy of the voter list because it is an

"output" of the localities' registration and maintenance efforts, not a "program or activity" used by the State Election Commission to register voters and maintain the accuracy of the list. Br. of Def.-Appellant 33–45. Moreover, South Carolina asserts that it is not required by South Carolina's open records law to provide the voter list because only South Carolina residents have a right to obtain the list under that law. *Id.* at 2. South Carolina's attempt to evade Section 8's transparency mandate should not be countenanced. The district court's ruling saying as much should therefore be affirmed.

## **ARGUMENT**

### I. **The Text of the NVRA Shows that It Was Enacted to Ensure Fairness and Transparency in Voter Registration.**

Congress passed the NVRA in 1993. Pub. L. No. 103-31, 107 Stat. 77 (52 U.S.C. §§ 20501–20511). Congress found that voting is a fundamental right, that governments must promote that right, and that discriminatory registration laws harm voter participation. 52 U.S.C. § 20501(a). Therefore, Congress set out to increase voter registration. 52 U.S.C. § 20501(b). At the same time, Congress intended "to protect the integrity of the electoral process," and "to ensure that accurate and

7

current voter registration rolls are maintained." *Id.* § 20501(b). And Congress incorporated several accountability measures to make sure states implemented the NVRA faithfully—including enforcement by the Department of Justice, penalties for non-compliance, private enforcement, and public transparency. The fairness and transparency goals are set forth primarily in Section 8 of the NVRA. *See id.* § 20507.

Section 8(i) is entitled "Public disclosure of voter registration activities." The text makes clear that Congress imposed broad public disclosure requirements on states. Not only are states required to "maintain for at least two years . . . all records concerning the implementation" of voter list maintenance efforts, but they must also make these records "available for public inspection." *Id.* § 20507(i)(1). Despite South Carolina's attempt to narrow the reach of the NVRA, the NVRA does not contain any limit on who can request these types of records, and the NVRA mandates disclosure of the very kind of records requested in this case.

The NVRA establishes that the types of records requested by PILF—South Carolina's statewide voter registration list—fall within the NVRA's public disclosure mandate. South Carolina argues that its

8

list, although the "output" or product of local registration and list maintenance efforts, is not "a program or activity" maintained by the State Elections Commission. Br. of Def.-Appellant 33, 38. But this argument is specious because the voter list is a voter registration record and, in any event, Section 8(i) encompasses not only registration records but also records "concerning" registration records.

Under the NVRA, the phrase "all records concerning" is expansive. First, the word "all" is a broad term indicating no exceptions. Second, the word "concerning," like terms "regarding" and "relating to," "'in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'" *Patel v. Garland*, 596 U.S. 328, 339 (2022) (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 710 (2018)). In *Patel*, the Supreme Court recognized that the term "regarding" extends to objects far broader than, and adjacent to, an identified subject. The Fourth Circuit also has recognized the breadth of the analogous statutory term "related to" to expand the scope of a federal statute's reach, concluding such terms are "clearly expansive" and encompass things beyond the specific subject of the statute. *Life Partners, Inc. v.*

*Morrison*, 484 F.3d 284, 297 (4th Cir. 2007) (interpreting state laws "related to" the business of insurance under the McCarran-Ferguson Act); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983) (interpreting expansive meaning of "relates to" in the Employee Retirement Income Security Act); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers*, 514 U.S. 645, 655 (1995) (same).

Consistent with this statutory interpretation, the Fourth Circuit has ruled that the phrase "all records concerning" voter registration in the NVRA is broad and expansive. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 336 (4th Cir. 2012). This Court observed that "the use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Id.* (quoting *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998)). Other federal courts in the Fourth Circuit have followed this Court's lead, including two district courts that have required states to make voter registration lists publicly available, the district court below in this case, *Public Interest Legal Found. v. Knapp*, 749 F.Supp.3d 563 (D.S.C. 2024), and the court in *Sullivan v. Summers*, No. MJM-24-172, 2025 WL 696549 (D. Md. Mar. 4, 2025).

Furthermore, amendments to the NVRA were passed in 2002 when Congress enacted the Help America Vote Act ("HAVA"), which reinforce the requirements for states. Pub. L. No. 107-252, 116 Stat. 1666 (2002) (52 U.S.C. §§ 20901–21145). HAVA requires each State to create "a single, uniform, official, centralized, interactive computerized statewide voter registration list," which "shall serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. § 21083(a)(1)(A). Under HAVA, after receiving registration applications, election officials must electronically enter the information "into the computerized list on an expedited basis." *Id.* § 21083(a)(1)(A)(vi). States must take specified steps to ensure the voter registration records are accurate and verifiable. *Id.* §§ 21083(a)(4), 21083(a)(5)(B)(i). Like the original NVRA provisions, these HAVA provisions promote accuracy and transparency objectives.

The voter registration list South Carolina seeks to withhold from Plaintiff-Appellee is just such a list as contemplated by 52 U.S.C. § 21083(a)(1)(A). And whether or not the South Carolina State Election Commission conducts the actual list maintenance, the statewide voter registration list that results from list maintenance efforts is both a list

11

maintenance record and, at minimum, a record "concerning" voter registration and list maintenance efforts. Organizations across the political spectrum have a right to obtain that list and assess the accuracy of the registration and list maintenance procedures in South Carolina. Thus, South Carolina's denial of public access to that list violates the purpose, intent, and text of the NVRA.

## II. The Legislative History of the NVRA Confirms that It Was Enacted to Ensure Fairness and Transparency in Voter Registration.

To the extent there remains any doubt that the text of the NVRA requires South Carolina to disclose the statewide voter registration list, the legislative history confirms that the NVRA sought to require broad public disclosure.

The legislative history shows that Congress sought to harmonize several policy objectives in the NVRA: a more "open registration process" and "the need to maintain the integrity of the election process by updating the voting rolls on a continual basis." S. Rep. No. 103-6, at 18 (1993). Indeed, "[t]he maintenance of accurate and up-to-date voter registration lists is the hallmark of a national system seeking to prevent voter fraud." *Id.* Thus, "the [NVRA] requires States to conduct a

program to maintain the integrity of the rolls." *Id.* The program must remove "ineligible voters from the official lists by reason of death or a change in residence." *Id.* In other words, the program must "insure that voting rolls will be free from 'deadwood.'" *Id.* at 20. Most significantly here, Congress understood that "an effective national voter registration program must also include a private civil enforcement . . . [which] can encourage action to assure that reasonable effort is undertaken to achieve its objectives in all States and, indeed, it may be essential to the success of such a program in some areas." Rep. No. 101-140, at 13 (1989). This means that Congress sought to permit parties to seek the very type of records at issue here—statewide voter registration lists. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024). And, notably, Congress did not limit this private civil enforcement only to certain individuals or entities. *Id.* Rather, it authorizes "nationwide" enforcement by parties. *See id.*

There could be no effective private civil enforcement or accountability without open disclosure of state registration records, including voter lists. South Carolina's actions here evade public

accountability for the state's fulfillment of its responsibilities under the

NVRA and will result in less accuracy and less trust in elections.

### III. Case Law Interpreting the NVRA Shows that It Was Enacted to Ensure Fairness and Transparency in Voter Registration—And to Hold State Registration Efforts Accountable.

This Court, and courts throughout this Circuit, consistently have

enforced a broad public disclosure rule under the NVRA. *See, e.g.,*

*Project Vote,* 682 F.3d at 336 (requiring Virginia to make registration

applications available to the public); *Sullivan*, 2025 WL 696549

(requiring Maryland to make its voter registration list available to the

public); *Knapp*, 749 at 563  (requiring South Carolina to make its voter

registration list available to the public).

This Court has recognized the importance of disclosing

registration records like the voter registration list requested here to

interested parties. For example, in *Project Vote*, this Court noted that it

is "self-evident" that disclosure of voter registration records "will assist

in the identification of both error and fraud in the preparation and

maintenance of voter rolls." *Project Vote*, 682 F.3d at 339. This Court

further explained that "[w]ithout such transparency, public confidence

in the essential workings of democracy will suffer." *Id.*

14

This Circuit is not alone. The First Circuit, in *Bellows*, emphasized the NVRA's fairness and transparency objectives in ruling that PILF could request voter registration data from Maine and that Maine's voter list was subject to public disclosure under Section 8(i). 92 F.4th at 49. The First Circuit highlighted how "[f]ederal law requires Maine to conduct activities for the purpose of ensuring the accuracy and currency of the state's official lists of eligible voters," *id.* at 45, and that the public access provision of Section 8(i) "evinces Congress's belief that public inspection . . . is necessary to accomplish the objectives behind the NVRA," *id.* at 54. The First Circuit further observed that public access and dissemination of voter registration data—even to nonresident organizations like PILF— "is necessary if members of the public, or organizations such as PILF [Plaintiff-Appellee here], are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA." *Id.* (citing *Project Vote*, 682 F.3d at 339).

Also relevant to this case, the residence or non-profit identity of the party requesting records in *Project Vote* was not even raised as a question under the NVRA. *See Project Vote*, 682 F.3d at 339. When the

15

lower court addressed whether the national nonprofit had standing to commence an action in federal court, the court emphasized that "the NVRA specifically provides a private right of action to *any* person who is aggrieved by a violation of the Public Disclosure Provision." *Project Vote/Voting for America, Inc. v. Long*, 752 F. Supp. 2d 697, 703-704 (E.D. Va. 2010) (emphasis added). In other words, a national organization like Project Vote or PILF is within its rights to request a statewide voter registration list under the NVRA because the NVRA was enacted to facilitate public disclosure of these types of records and promote transparency nationally.

South Carolina's concealment of its statewide voter registration list here flouts court decisions around the country and thwarts the well-established right of the public to assess the state's fulfillment of its voter registration responsibilities.

## IV. Government Transparency, Especially Vis-à-vis Elections, is Key to Public Trust in Government.

"Transparency and democracy intertwine, based on the premise that exposing powerful institutions to the light of ongoing scrutiny [will] not only disinfect those institutions but also bring about a more effective, responsive, and democratic regulatory state." Rebecca Green,

16

*FOIA-Flooded Elections*, 85 Ohio St. L.J. 255, 262 (2024) (citation and internal quotation marks omitted) (alteration in original). In addition to allowing for an informed citizenry, open records laws exist both "to check potential government abuses" and to engender confidence in government. *Id.* (citations omitted). When it comes to the electoral process, transparency is crucial for another reason: "securing public trust in election outcomes." *Id.*

It is imperative, then, for states to provide election data and documents in response to proper public requests, whether production of the data or documents is mandated by the NVRA or state open records laws. Open government like this "should not be dismissed as a convenient formalism." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004). Instead, it is a "structural necessity" for any thriving democracy. *Id.* at 172. Indeed, public records "by their very nature are of interest to those concerned with the administration of government," and providing the true contents of those records serves a public benefit. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975). This is especially so in democratically structured governments where the

17

"citizenry is the final judge of the proper conduct of public business." *Id.* at 495.

The long tradition of public access to trials serves as a useful analogy. Tracing back to 1066 when William the Conqueror invaded England, the public trial was cemented in American court procedure via the Sixth Amendment. Note, *Legal History: Origins of the Public Trial,* 35 Ind. L.J. 251, 251, 256 (1960). Indeed, "our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." *Smith v. Doe*, 538 U.S. 84, 99 (2003). Public access to criminal trials "safeguard[s] against any attempt to employ our courts as instruments of persecution." *In re Oliver*, 333 U.S. 257, 270 (1948). "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *Id.*

So too with the electoral process:

> Election designers have long understood that just
> as trials must be open to the public to ensure the
> decisions of courts are abided, so too must elections
> be transparent to satisfy public confidence that

18

> elections are administered fairly, according to the law, and that the winner of the most votes gains office.

Green, *FOIA-Flooded Elections*, *supra*, at 262 (citing Margaret B. Kwoka, *Saving the Freedom of Information Act* 11–19 (2021)).

In sum, Section 8 of the NVRA affords national political organizations with great interest in elections across the country a uniform right to transparency in national elections and thereby advances important democratic principles.

## V.    Unfortunately, Some State Public Records Laws Are Weaponized to Restrict Public Access to Voter Registration Information.

That the public should have access to a wide range of election records should not be a controversial proposition. Political organizations across the political spectrum need unrestricted access to state voter rolls in order to pursue their political missions and hold states accountable for accurate voter registration. Open records laws are meant to facilitate public access to government records and communications, but, unfortunately, they often are invoked as a shield to stymie public access to critical voter registration information. That leaves the NVRA as the only reliable and practical legal mechanism to

make elections transparent in the critical aspect of who the state recognizes as the qualified electorate and what it is doing to ensure its records are accurate.

Several states restrict public records requests to their residents. *See, e.g.*, Ala. Code § 36-12-40(a) ("*Every resident* has a right to inspect and take a copy of any public record of this state . . . ."); Ark. Code. § 25-19-105 ("[P]ublic records shall be open to inspection and copying . . . *by any citizen* of the State of Arkansas."); Del. Code tit. 29, § 10003(a) ("Reasonable access to and reasonable facilities for copying of [public records] shall not be denied *to any citizen*."); N.J. Stat. Ann. § 47:1A-1 (same); Tenn. Code § 10-7-503 ("All state, county and municipal records shall . . . be open for personal inspection *by any citizen* of [the State of Tennessee]."); Va. Code §2.2-3704(A) ("[A]ll public records shall be open to *citizens of the Commonwealth* . . . .") (all emphases added). In these states, the NVRA is the only way that interested non-resident parties can seek records related to voter registration.

Indeed, in this case, the South Carolina State Election Commission denied Plaintiff-Appellee's request for the state's voter registration list, claiming it was available "only to qualified electors in

20

South Carolina," not to out-of-state organizations. *Knapp*, 749 F.Supp.3d at 567 (citing S.C. Code Ann. § 7-3-20(D)(13)).

And South Carolina is not alone in flouting its responsibilities under the NVRA. Minnesota specifically carves out voter rolls from its public records laws and denies access to out-of-state organizations. *Compare* Minn. Stat. §§ 13.01, Subd. 10, 13.03, Subd. 3(a) (granting any person the right to inspect "public government data"), *with* Minn. Stat. § 201.091, Subds. 4(a), 5 (limiting inspection and copying of the "public information list," which contains voter information, to "any voter registered in Minnesota"). Minnesota courts in particular have recently gone so far as to deny the Plaintiff-Appellee here access to the state's voter roll under Minn. Stat. § 201.091, Subds. 4(a), 5, while simultaneously rejecting that nonprofit's claim to the same information under federal law. *See Pub. Int. Legal Found., Inc. v. Simon*, No 24-cv-01561 (SRN/DJF), 2025 WL 835818, at *1 (D. Minn. Mar. 17, 2025).

In yet other cases of state resistance, states have invoked state laws in an improper effort to stop requestors from using registration records to assess the accuracy of registrations. For example, in *Bellows*, the Maine open records law prohibited the requester from, among other

things, using election records requested under Section 8 of the NVRA to evaluate another state's compliance with its voter list maintenance obligations. 92 F.4th at 54. The First Circuit intervened to require Maine to live up to its obligations under the NVRA. *Id.* The same kind of federal court enforcement was necessary to make Maryland make its records available to the public. *Sullivan*, 2025 WL 696549.

The upshot is that in states that either restrict public records access by state residency or narrowly limit access to voter rolls—and several of these are states where political contests are often decided by slim margins—the NVRA serves as the only viable mechanism for national political organizations to obtain voter information essential to their political missions and to hold states accountable to their federal legal obligations.

In its own nationwide request for records under the NVRA, the RNC has encountered resistance from a number of states claiming that their open records laws limit the records to which the RNC is entitled. Thus, national political organizations like the RNC cannot obtain information about voter registration from those states if they can decline requests under the NVRA, like South Carolina has done here.

22

Because of such state resistance, the RNC urges this Court to enforce emphatically the public disclosure requirement of the NVRA here.

## VI. The District Court's Decision Upholds Congress's Transparency Objectives and Supports Democratic Engagement and Public Confidence.

The district court got it right when ruling that the NVRA entitles Plaintiff-Appellee to South Carolina's statewide voter registration list. The district court's ruling supports Congress's transparency objectives under the NVRA by ensuring that the voter registration list is available for public inspection by parties like Plaintiff-Appellee, thereby assisting in identifying errors and fraud in voter roll maintenance. The NVRA was enacted to increase voter registration, enhance voter participation, protect electoral integrity, and ensure accurate voter registration rolls. The district court highlighted that the NVRA's disclosure mandate is expansive, covering all records related to voter list maintenance, and that the voter registration list, as a reflection of these activities, must be disclosed. *Knapp*, 749 at 569. The district court also ruled that the NVRA preempts state restrictions like South Carolina's residency requirement. *Id.* at 572. The district court's decision aligns with the NVRA's purpose by promoting transparency and accountability in voter

23

registration processes, which are essential for democratic engagement and public confidence. "Without such transparency, public confidence in the essential workings of democracy will suffer." *Project Vote*, 682 F.3d at 339.

By mandating the disclosure of the voter registration list, the district court's ruling enhances democratic engagement by allowing public access to voter registration information, which can help identify and rectify errors and fraud. This transparency is crucial for maintaining public confidence in the electoral process, as it ensures that voter registration rolls are accurate and current. Limiting the voter registration list to South Carolina residents, precluding national organizations from having access to those records on behalf of adherents in the state, limits the number and rigor of the reviews that could ensure voter roll accuracy, which runs counter to the purpose of the NVRA.

The district court's decision underscores the importance of public oversight in electoral processes, reinforcing the NVRA's role in fostering an informed and engaged electorate. The ruling also demonstrates the commitment of federal law to upholding the integrity of elections by

preempting state laws that hinder transparency and public access to

voter registration information.

## <u>**CONCLUSION**</u>

For the reasons discussed above, this Court should affirm the

district court's decision granting Plaintiff-Appellee summary judgment.

 */s/ Lee E. Goodman*
Lee E. Goodman (DC 435493/VA 31695)
Michael A. Columbo (DC 476738)
Josiah Contarino (DC NY0612)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
415-433-1700
lgoodman@dhillonlaw.com
mcolumbo@dhillonlaw.com
jcontarino@dhillonlaw.com

May 12, 2025

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all counsel of record this 12th day of May 2025, via the Court's CM/ECF system, which will provide notice to all counsel of record, and I will mail a paper copy of this brief addressed to the Clerk of the Court.

*/s/ Lee E. Goodman*

## CERTIFICATE OF COMPLIANCE WITH FRAP 29 AND 32

This brief complies with the type-volume limitations of FRAP 29(a)(5) because it does not exceed 6,500 words (it is 4610 words), excluding the parts of the brief exempted by FRAP 32(f).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because the brief has been prepared in proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook font.

*/s/ Lee E. Goodman*

26